**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                          :
ALBERT FORTUNATO,                    :        CIVIL ACTION
                                    Plaintiff,       :
                                                          :
        vs.                                           :        NO. 10-3289
                                                          :
NESTLE WATERS NORTH AMERICA,    :
JAMES BLAIR, BILL TRACKIM and       :
KEN SAFFT,                                      :
                                    Defendants.   :
_____:

Henry S. Perkin, M.J.                                           September  28th ,  2011

<u>MEMORANDUM</u>

        Plaintiff, Albert Fortunato ("Mr. Fortunato"), was employed by Defendant Nestle

Waters North America, Inc. ("NWNA") as its National Transportation Manager.  Mr. Fortunato

contends that he was terminated from employment on January 9, 2009 in violation of the Age

Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act

("PHRA").  <u>See</u> 29 U.S.C. § 621, <u>et</u> <u>seq.</u>; 43 Pa. C.S.A. § 951, <u>et</u> <u>seq.</u>  Presently before the Court

is Defendants' Joint Motion for Summary Judgment and Mr. Fortunato's Motion for Summary

Judgment.  For the reasons that follow, Defendants' Motion will be granted as to Mr. Fortunato's

ADEA claims against Defendants James Blair, Bill Trackim and Ken Safft and Mr. Fortunato's

PHRA claims.  Defendant's Motion will be denied as to Mr. Fortunato's ADEA claims against

NWNA.  Mr. Fortunato's Motion will be granted, and the parties shall continue to litigate Mr.

Fortunato's ADEA claims against NWNA.

# I.   **BACKGROUND.**[1]

Mr. Fortunato is a forty-nine year old adult individual.  (Compl. ¶ 5; Ans. ¶ 5;

---

[1]      Plaintiff did not file a statement of undisputed facts as required by the Court's Scheduling Order, but responded with a dispute of five facts in Defendants' statement of undisputed facts.  Those disputed facts as set forth by Defendant and responded to by Plaintiff are as follows:

1)   Defendants' Fact No. 14:  The Agreement expressly provides that Fortunato released claims under the Age Discrimination in Employment Act ("the ADEA") and Fortunato testified that he understood that he was releasing such claims.  (Agreement at p. 6-7 (Ex. G); Fortunato Dep. 49:23-24 - 50:1-19 (Ex. C)).

Plaintiff's Response:  Disputed.  Plaintiff testified in the cited portions of his depositions that he understood that he was releasing NWNA because of an on-going RIF, which Safft represented was the reason for his termination.  (Agreement at p. 6-7 (Ex. G); Fortunato Dep. 49:23-24 - 50:1-19 (Ex. C)).
Furthermore, the Separation Agreement itself references being in connection with a Reduction in Force, as set forth in Plaintiff's Motion for Partial Summary Judgment.

2)   Defendants' Fact No. 17:  Fortunato knew from his review of the document that he had twenty-one (21) days to consider the Agreement before signing it.  (Fortunato Dep. 30:13-16 (Ex. C; Agreement at p. 6 (Ex. G)).  Safft also told Fortunato that he had 21 days to review the Agreement.  (Safft Dep. 38:15-25 - 39:1-13 (Ex. F)).

Plaintiff's Response: Disputed.  In fact, Mr. Fortunato did not testify that he understood that he had twenty-one days to consider the document.  His testimony in the cited portion of his deposition was that "I read it." However, at 44:6-12, he testified that he was confused by the contradictory statements in the Severance Agreement which stated both that he had twenty-one and forty-five days to consider the Agreement.  (Plaintiff's Exhibit B; Defendant's Exhibit C).

3)   Defendants' Fact No. 18:  During the Meeting, Safft explained to Fortunato that if the Agreement was not signed by the following Wednesday, the payroll cutoff, there might be a break in Fortunato's pay and benefits, but once the Agreement's revocation period expired, his pay and benefits would commence again. (Safft Dep. 38:15-25 - 39:1-13 (Ex. F)).

Plaintiff's Response: Disputed.  Plaintiff testified that Safft told him that his pay and benefits would be discontinued unless he executed the Agreement by January 14 (19:6-10) and denied that Safft told him it would be retroactively paid if he executed the Agreement after January 14 (25:19-26:2).  (Plaintiff's Exhibit B; Defendant's Exhibit C).

4)   Defendants' Fact No. 21:  There was no reduction in force ("RIF") that effected supply chain employees occurring in January, 2009 when Fortunato was terminated.  (Safft Dep. 48:10-21 (Ex. F); Trackim Aff. ¶ 9 (Ex. D); Blair Aff. ¶ 8 (Ex. E)).  There was a RIF that occurred prior to January, 2009 involving the supply chain but that RIF only effected employees in a specific plant in Northern California.  (Safft 49:9-25 - 50:1-19 (Ex. F); Trackim Aff. ¶ 9 (Ex. D); Blair Aff. ¶¶ 8 (Ex. E)).

Plaintiff's Response:  Disputed.  Plaintiff testified that as National Transportation Manager he was aware that there was an on-going reduction in force at the time he was released (14:8-12), that he was released as part of the RIF (22:11-13), and that Safft told him that he was being released pursuant to a RIF (46:20-22). (Plaintiff's Exhibit B).

5)   Defendants' Fact No. 22:  No one in Breinigsville, PA, where Fortunato worked, was part of the supply chain RIF that was completed prior to January 2009.  (Trackim Aff. ¶¶ 9-10 (Ex. D); Blair Aff. ¶¶ 8-9 (Ex. E); Fortunato Dep. 14:21-24 - 15:1 (Ex. C).

Plaintiff's Response:  Disputed.  Nowhere in the cited portion of Plaintiff's deposition (nor anywhere else) is he asked nor testified that no one in Breinigsville was affected by the Supply Chain RIF.  To the contrary, in the testimony cited in response to ¶ 21, Plaintiff testified that he was affected by the RIF.

Fortunato Dep. 7:5-9).  NWNA has a place of business in Breinigsville, Pennsylvania, where Mr.

Fortunato was employed as the National Transportation Manager.  (Compl. ¶ 7; Ans. ¶ 7;

Fortunato Dep. 9:10-18, 14:21-24-15:1).  Mr. Fortunato graduated from St. Peter's College with

a B.S. in Computer Science and a minor in Mathematics.  (Fortunato Dep. 8:11-16).  Defendants,

James Blair ("Mr. Blair"), Bill Trackim ("Mr. Trackim") and Ken Safft ("Mr. Safft") are adult

individuals residing in Pennsylvania.  (Compl. ¶ 8, ¶ 9, ¶ 10; Ans. ¶ 8, ¶ 9, ¶ 10).  Mr. Trackim

was Mr. Fortunato's direct supervisor from September 2002 until late 2007, and he is currently

Vice President of NWNA's Supply Chain.  (Fortunato Dep. 9:5, 24-10:1-5; Trackim Aff. ¶¶ 1-2).

Mr. Blair was Mr. Fortunato's supervisor from late 2007 until January 9, 2009 and is NWNA's

Director of Logistics Operations.  (Fortunato Dep. at 10:12-22; Blair Aff. ¶¶ 1-2).  Mr. Safft was

NWNA's National Director of Human Resources.  (Safft Dep. 10:22-25 – 11:1-3).

       On January 9, 2009, Mr. Fortunato met with Messrs. Blair, Trackim and Safft in

the Breinigsville office ("Meeting").  (Fortunato Dep. 14:13-24 –16:1-15.)  The Meeting began

with Mr. Blair informing Mr. Fortunato that he was being terminated.  (Fortunato Dep. 16:8-12;

Trackim Aff. ¶ 6; Blair Aff. ¶ 5; Safft Dep. 31:7-13.)  During the Meeting, Mr. Safft gave Mr.

Fortunato a Confidential Separation Agreement and General Release ("Separation Agreement").

(Fortunato Dep. 17:18-21.)  Mr. Safft reviewed the Separation Agreement with Mr. Fortunato

paragraph by paragraph and asked Mr. Fortunato if he had any questions.  (Fortunato Dep.

19:19-24-20:1-4; Safft Dep. 34:22-24-37:1-17.)

       The Separation Agreement provides that Mr. Fortunato releases claims under the

ADEA and Mr. Fortunato testified that he understood that he was releasing such claims.

(Separation Agreement at p. 6-7; Fortunato Dep. 49:23-24-50:1-19.)  Mr. Fortunato

acknowledged that he received an additional three months of salary known as severance pay as compensation in exchange for signing the Separation Agreement in addition to that which he was already entitled. (Fortunato Dep. 52:15-22; Separation Agreement at 1.) Mr. Fortunato also received outplacement services at NWNA's expense. (Fortunato Dep. 34:14-24.) The Separation Agreement informed Mr. Fortunato to consult with an attorney. (Separation Agreement at 6.) Mr. Fortunato understood both from his review of the Separation Agreement and from Mr. Safft telling him, that he had the right to consult with an attorney before signing the Separation Agreement. (Fortunato Dep. 42:13-21.)

The Separation Agreement provides and Mr. Fortunato acknowledged in his deposition testimony that he had seven (7) days to revoke the Agreement after signing it. (Fortunato Dep. 42:22-24- 43:1-4; Safft Dep. 38:15-25-39:1-13; Separation Agreement at 6.) Mr. Fortunato reviewed the Separation Agreement between January 9 and 14, 2009. (Fortunato Dep. 43:5-9.)

Mr. Fortunato testified during his deposition testimony that during the last week in January or the first week in February, he learned that he was not terminated as part of an alleged reduction in force ("RIF"). (Fortunato Dep. 41:18-22.) He stated that when he was terminated, he did not ask whether his termination was the result of a RIF, he did not receive a list of other employees terminated as a result of a RIF and he did not ask who else was terminated as a result of a RIF. (Fortunato Dep. 20:16-22; 61:15-21.) Mr. Fortunato did not attempt to contact anyone at NWNA to question the reason for his termination after he allegedly found out his termination was not the result of a RIF. (Fortunato Dep. 56:21-24 – 57:1-10.)

II.    **PROCEDURAL HISTORY**.

On July 7, 2010, Mr. Fortunato filed a two-Count Complaint against NWNA, Mr.

Blair, Mr. Trackim and Mr. Safft, alleging that he was subjected to disparate treatment in

violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.

(Count I) and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951, et seq

(Count II) on the basis of his age, which was forty-seven (47) at the time he was terminated from

NWNA.  On August 31, 2010, Defendants filed an Answer with Affirmative and Additional

Defenses and Counterclaim, denying Plaintiff's claims.  In their Counterclaim, Defendants

contended that the Separation Agreement Plaintiff signed bars the instant action because Plaintiff

waived his right to sue for discrimination under the ADEA.

This case was originally assigned to the docket of the Honorable James Knoll

Gardner.  On November 16, 2010, Judge Gardner signed the consent and order referring this case

to the undersigned to conduct all proceedings and order the entry of judgment in accordance with

28 U.S.C. section 636(c) and Federal Rule of Civil Procedure 73.   Subsequently, counsel for

Plaintiff and Defendants agreed, with this Court's approval, to bifurcate this matter so that

discovery related only to the Separation Agreement would be conducted by February 25, 2011,

followed by dispositive motions.  On March 28, 2011, both Plaintiff and Defendants filed their

respective Motions for Summary Judgment.  On April 15, 2011, Defendants filed their

Memorandum of Law in Opposition to Plaintiff's Motion, and on April 18, 2011, Plaintiff filed

his Response in Opposition to Defendants' Motion.

III.    **STANDARD OF REVIEW.**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary

5

judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Celotex, 477 U.S. at 325). To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's

<u>Motor Transit Co.</u>, 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotations omitted).

## IV.   <u>DISCUSSION.</u>

Defendants argue the following grounds in their Motion for Summary Judgment: (1) the Separation Agreement bars Plaintiff's ADEA claims because it complied with the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626; (2) Plaintiff cannot prove that he signed the Separation Agreement under duress; (3) Plaintiff's claims against Blair, Trackim and Safft pursuant to the ADEA fail because the ADEA does not provide for individual liability; and (4) the Separation Agreement bars Plaintiff's PHRA claims because he made a knowing and voluntary waiver of his right to pursue claims under the PHRA.  Plaintiff contends in his Motion for Summary Judgment that: (1) the Separation Agreement does not comply with the "strict, unqualified statutory structure stricture on waivers" imposed on the release of age discrimination cases under the OWBPA; and (2) the Separation Agreement is ineffective to release Plaintiff's age discrimination claims.

### A.     **Plaintiff's Claims Under the PHRA and Against the Individual Defendants.**

Plaintiff concedes that his claims under the PHRA and against the Individual Defendants should be dismissed.  <u>See</u> Pl.'s Ans Defs.' Mot., p. 1 n.1.  Thus, summary judgment is granted to the Defendants on Plaintiff's PHRA claims which comprise Count II of the Complaint, and Plaintiff's claims under the ADEA against Defendants James Blair, Bill Trackim and Ken Safft in Count I of the Complaint.  Plaintiff's remaining claim is an ADEA claim against NWNA in Count I of the Complaint.

**B.      Whether the Separation Agreement Bars Plaintiff's ADEA Claims Against NWNA.**

Waivers of ADEA claims are governed by the OWBPA, which provides that any effective waiver of rights or claims under the OWBPA must be "knowing and voluntary." Wastak v. Lehigh Valley Health Network, No. CIV.A. 00-4797, 2002 WL 468709, at * 4 (E.D. Pa. Mar. 27, 2002)(Hutton, J.).  The OWBPA states that a waiver may not be considered knowing and voluntary unless at a minimum--

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or
>
> (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;
>
> (H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the

employer (at the commencement of the period specified in subparagraph (F))
informs the individual in writing in a manner calculated to be understood by the
average individual eligible to participate, as to--

> (i) any class, unit, or group of individuals covered by such
> program, any eligibility factors for such program, and any time
> limits applicable to such program; and

> (ii) the job titles and ages of all individuals eligible or selected for
> the program, and the ages of all individuals in the same job
> classification or organizational unit who are not eligible or selected
> for the program.

29 U.S.C.A. § 626(1).  In the case of a reduction in force ("RIF"), other factors must be met and

the twenty-one day consideration period is extended to forty-five days.  29 U.S.C. §626(f)(1).

1.    Whether the Separation Agreement Was Written In A Manner Calculated
to Be Understood By Mr. Fortunato or the Average Individual.

In order for a waiver of claims under the ADEA to be knowing and voluntary, the

waiver must be "written in a manner that is calculated to be understood by such individual, or by

the average individual eligible to participate." 29 U.S.C. §626(f)(i)(A); see also 29 C.F.R.

§1925.22(b)(1); Ricciardi v. Electronic Data Systems Corp., No. 03-5285, 2007 WL 576323, *5

(E.D. Pa. Feb. 20, 2007).  In other words, the waivers "must be drafted in plain language geared

to the level of understanding of the individual party to the agreement or individuals eligible to

participate."  29 C.F.R. §1625.22(b)(3).  In determining the level of understanding at issue, the

employer should take into account such factors as the level of comprehension and education of

typical participants.  29 C.F.R. §1625.22(b)(3).  According to the regulations, the OWBPA

waiver "must not have the effect of misleading, misinforming, or failing to inform participants

and affected individuals.  Any advantages or disadvantages described shall be presented without

either exaggerating the benefits or minimizing the limitations."  29 C.F.R. §1625.22(b)(4).

9

Mr. Fortunato graduated from high school and then from St. Peter's College in New Jersey with a Bachelor of Science degree. (Fortunato Dep. 8:11-16.) He was the National Transportation Manager of NWNA, he is an educated man and is arguably able to understand the language provided in the Agreement.

      2.     <u>Whether the Agreement Requires Mr. Fortunato to Release Claims Arising After His Execution of the Agreement</u>.

The section of the Separation Agreement entitled "Agreement of Claims," states "this Agreement does not, however, waive rights or claims that may arise after the date you sign it below." (Separation Agreement p. 5.) No evidence exists and Mr. Fortunato does not contend that the Separation Agreement required him to release claims arising after its execution.

      3.     <u>Whether Mr. Fortunato Waived His Rights In Exchange for Consideration In Addition to That Which He Was Already Entitled</u>.

Mr. Fortunato received consideration for signing the Separation Agreement. On the first page of the Separation Agreement in the section entitled "Post-Separation Benefits," it states:

> in consideration for your executing and not revoking this Agreement and for your abiding by its terms, we will pay you as Separation Pay an amount equal to your regular weekly base salary that you would have earned during the period commencing on your Separation Date and continuing through April 3, 2009 (the "Separation Pay Period"), had you remained employed during that period.

(Separation Agreement at 1.) Mr. Fortunato received three months of separation pay which was offered in addition to any amounts to which he was already entitled. He admits to collecting that separation pay in his deposition testimony which provides:

Q.     I believe you testified earlier that you did receive your severance as a result of signing the Agreement?

A.      Yes.

Q.      How much pay did you receive, was it 12 weeks?

A.      It was 12 weeks.

(Fortunato Dep. 52:16-22.)  The separation pay was paid to Mr. Fortunato incrementally on

normally scheduled payroll dates.  (Id.)  Mr. Fortunato was provided and used out placement

services to help him find other employment. (Fortunato Dep. 34:14-24.)  As a result, the

OWBPA requirement that Mr. Fortunato be provided with consideration in addition to that which

he was already entitled was met.

> 4.      Whether the Separation Agreement Advised Mr. Fortunato to Consult
>         With An Attorney Prior to Executing the Agreement.

On the sixth page of the Separation Agreement in the section entitled

"Consideration Period," Mr. Fortunato is advised in writing to consult with an attorney.

(Separation Agreement at 6.)  The first sentence of that section states: "because the arrangements

discussed in this Agreement affect important rights and obligations, we advise you to consult

with an attorney before you agree to the terms set forth herein."  (Id.)   In the following

deposition testimony, Mr. Fortunato concedes that the Separation Agreement advised him to

consult with an attorney and that he attempted to do so:

Q.      Getting back to the Agreement, did you understand from your review of
        the Agreement that you had the right to consult with an attorney –

A.      Yes.

Q.      -- before signing it?

A.      Yes.

Q.      Did Mr. Safft explain that to you?

11

A.      Yes, he did.

(Fortunato Dep. 42:13-21; 41:4-11.)  Because Mr. Fortunato acknowledges he was advised in

writing and told verbally to consult with an attorney, the Separation Agreement complies with

the OWBPA requirement that Mr. Fortunato must be advised in writing to consult with an

attorney.

> 5.      Whether the Separation Agreement Specifically Refers to Rights or Claims
> Arising Under the ADEA.

The next OWBPA requirement for voluntary waivers states that the waiver must

specifically refer to the rights being waived as rights arising under the ADEA.  See §

626(f)(1)(b).  The section of the Separation Agreement titled "Agreement of Claims" states:

> you hereby release and forever discharge the Company . . . from any and all
> claims, liabilities, agreements, damages, losses or expenses (including attorney's
> fees and costs actually incurred) of any nature whatsoever, whether known or
> unknown (hereinafter "Claim" or "Claims"), that you have, may have had, or may
> later claim to have had . . . . resulting from anything that has occurred prior to the
> date you execute the agreement.  **This release includes, but is not limited to,
> any Claims for back pay, liquidated damages, compensatory damages, or any
> other losses or other damages to you or your property resulting from any
> claimed violation of local, state or federal law, including, for example (but
> not limited to), claims arising under . . . the Age Discrimination in
> Employment Act of 1967, 29 U.S.C. §621 et seq.**

(Separation Agreement at 4-5(emphasis added).)  In the above-referenced section, Mr. Fortunato

was notified of the claims that he was releasing by signing the Separation Agreement, including

claims under the ADEA.

In the section entitled "Promise Not to Sue About Claims That Have Been

Released" the Separation Agreement provides:

> You agree that, except to the extent such right may not be waived by law, you will
> not commence any legal action or lawsuit or otherwise assert any legal claim

12

seeking relief for any Claim released or waived under the Release of Claims
provision above. **This "agreement not to sue" does not, however, prevent or
prohibit you from later filing a lawsuit challenging the validity of your
release of Claims under the Age Discrimination in Employment Act
("ADEA").**

(Id. at 5 (emphasis added).)  The Separation Agreement sets out a separate statement that Mr.

Fortunato did not waive his ability to challenge the validity of the release under the ADEA.  Mr.

Fortunato testified that he understood he was releasing his right to sue for discrimination under

the ADEA as follows:

> Q.   But did you understand from this document that you were waiving claims
>      for discrimination against the company?  I understand what you're saying
>      about the company not telling you it was a reduction in force, when in fact,
>      you found out that it was not, but apart from all that, did you understand
>      from this document that you were releasing claims against the company?
>
> A.   I knew that's what it said, yes.

(Fortunato Dep. 49:23-24-50:1-7.)   The Separation Agreement specifically refers to rights or

claims arising under the ADEA and meets that OWBPA requirement.

>         6.      Whether Mr. Fortunato Was Given the Requisite Time Period to Consider
>                 the Separation Agreement.

>         The Separation Agreement contains two sections entitled "Consideration Period."

In the first "Consideration Period" paragraph, it states that:

> You have twenty-one (21) days from the date you receive this Agreement within
> which to consider it, and you may take as much of that time as you wish before
> signing.  If you decide to accept the benefits offered herein, you must sign this
> Agreement on or before the expiration of the 21-day period and return it promptly
> to the Company.   If you do not wish to accept the terms of this Agreement, you
> do not have to do anything.

(Separation Agreement at 6.)  On the seventh page, a second "Consideration Period" paragraph

provides:

> You have twenty-one (21) days from the date you receive this Agreement within
> which to consider it, and you may take as much of that time as you wish before
> signing.  If you decide to accept the benefits offered herein, you must sign this
> Agreement on or before the expiration of the 45-day period  and return it promptly
> to the Company.  If you do not wish to accept the terms of this Agreement, you do
> not have to do anything.

(Id. at 7.)  There is an obvious internal error within the second "Consideration Period" paragraph

in the Separation Agreement as well as between the two paragraphs labeled "Consideration

Period."  The Defendants contend that this is merely a typographical error and, regardless of the

discrepancy, Mr. Fortunato understood that he had twenty-one (21) days to sign the Agreement as

he testified at his deposition:

> Q.    Did you know from reading the document that you had 21 days to consider
>       the document before signing it?
>
> A.    Yes, I did read it.

(Fortunato Dep. 30:13-16.)  Mr. Fortunato later in his deposition testimony states:

> Q.    Was there anything unclear about that agreement to you?  Putting aside the
>       fact that you had the college payments, was there anything unclear about
>       the document itself that you had questions about before you signed it?
>
> A.    Not that I had specific questions about, but I was a little unclear on the
>       consideration period and that it was stated twice and it seemed to be
>       contradictory.
>
> Q:    Meaning the 21 days and 45 days?
>
> A:    Yes.
>
> Q:    Did you want to question Mr. Safft or anybody at the company about that
>       discrepancy?
>
> A:    I did try to reach Mr. Safft.
>
> Q:    Before January 14th?

14

A:      Yeah, it was on the 13th.

Q:      And what happened?

A:      No response.  I had called him probably three times that day.

Q:      Did you leave a message?

A:      Yes.

Q:      Did he ever get back to you?

A:      I even called his cell phone.

Q:      He never got back to you?

A:      He did about a week later and apologized that he was traveling and so forth.

Q:      Did you ask him at that point in time about the discrepancy after he got back to you?

A:      No, I didn't.

Q:      Why not?

A:      I had already signed it.

Q:      Did you still have seven days to revoke it?  Were you still within the revocation period?

A:      Not at the point I had talked to him, no.  That had expired.

(Fortunato Dep. at 43:24-44:23.)  Mr. Fortunato contends that his release of all claims by signing the Separation Agreement was ineffective because the Separation Agreement is internally inconsistent and did not accurately apprise him of the rights that he was relinquishing, did not accurately state the consideration period, and did not contain all the information that was required.  Mr. Fortunato notes that the Separation Agreement misstates the amount of time he

15

had to consider the Separation Agreement.  If his termination was performance-based, the

OWBPA requires a twenty-one (21) day consideration period.  If his termination was made

pursuant to a reduction in force, the consideration period is forty-five (45) days.  Plaintiff is

correct that the Separation Agreement does not clearly state which time period is applicable to

him.  Adding further confusion is the language in the last paragraph of the Separation Agreement

stating the following:

> I acknowledge that I first received this Agreement on January 9, 2009 <u>along with</u>
> <u>the attached Summary Plan Description for The Nestle Waters North America</u>
> <u>Separation Plan For Reductions in Force, that sets forth the group of employees</u>
> <u>eligible to receive the separation benefits and eligibility factors and time limits</u>
> <u>applicable, and a list that sets forth the job title and ages of all eligible individuals,</u>
> <u>the ages and job titles of all individuals in the same job classification or</u>
> <u>organizational unit who are not eligible for these separation benefits.</u>

(Separation Agreement at 8 (emphasis added).)  Notwithstanding the language in this final

acknowledgment paragraph and Mr. Fortunato's signature on this acknowledgment, he did not

receive any Summary Plan Description for The Nestle Waters North America Separation Plan

For Reductions in Force.

     Defendants argue in their Motion for Summary Judgment that Mr. Fortunato does

not contend or provide evidence that he attempted to return the signed Severance Agreement

after the twenty-one (21) day period but within the forty-five (45) day period nor does he show

that NWNA would not accept the executed Severance Agreement.  (Fortunato Dep. 44:6-10.)

Rather, according to Defendants, Mr. Fortunato contends only that he was told by Mr. Safft that

if he did not return the release by January 14, 2009, his pay and benefits would be discontinued.

(Fortunato Dep. 24:13-24-25:1-5).   Mr. Safft testified in his deposition that, in the interest of full

disclosure, he explained to Mr. Fortunato the consequences that would ensue if Mr. Fortunato did

not sign the document before the twenty-one (21) day period expired:

> Q.      Did you say anything to Mr. Fortunato about any consequences that might ensue if the document was not signed sooner than 21 days?
>
> A.      I did.  And I don't recall whether it was a question asked, or part of my explaining process.  I explained to him that, you know, he had the 21 days to sign it, the seven days following; that once he did that, you know certainly he would be entitled to the pay.  But from an administrative standpoint, on the Wednesday following our meeting was the next payroll cutoff cycle.  So in the event that he had not signed it by then, you know, there was a potential that he would see a temporary – provided that he signed it later on and didn't revoke – you know, break in his pay in benefits.  But once the revocation period expired, his benefits would be made retroactive and his pay would commence again.

(Safft Dep. 38:15-25 – 39:1-13.)  Mr. Fortunato did not ask Mr. Safft any questions

regarding the fact that although he had twenty-one (21) days to consider the document, his pay

would stop on January 14, 2009 if he had not yet signed the Separation Agreement by that date.

(Fortunato Dep. 30:13-20.)

Defendants argue that NWNA informed Fortunato that he had the requisite

twenty-one (21) days to sign the release (Separation Agreement at 6; Fortunato Dep. 30:13-16)

and the fact that Mr. Safft informed Mr. Fortunato that he would not be paid during the

twenty-one (21) day consideration period and that his pay would stop on January 14, 2009 if he

had not signed the Separation Agreement by that time, does not change the fact that NWNA

satisfied the requirement that it give Fortunato twenty-one (21) days to consider the Separation

Agreement before signing it.

This Court does not agree with Defendants, however, that the Separation

Agreement *explicitly* provided for a twenty-one (21) day consideration period and not a forty-five

(45) day consideration period and that Mr. Fortunato knew that he had twenty-one (21) days to

sign the Separation Agreement.  The Defendants' "typographical error" goes to a critical element and creates a conflict within the Separation Agreement.  The multiple "Consideration Period" paragraphs in the Separation Agreement do not support Defendants' description that the consideration period was *explicitly* set forth.  Further, the language in the acknowledgment paragraph which refers to the Summary Plan Description for The NWNA Separation Plan For Reductions in Force adds support to Mr. Fortunato's contention that he was told that his employment was being terminated as a result of a RIF.  Testimony and sworn statements from Mr. Fortunato, Mr. Blair, Mr. Trackim and Mr. Safft, all of whom were in the termination meeting differs in that Messrs. Blair, Trackim and Safft contend that Mr. Blair told Mr. Fortunato that he was being terminated for performance reasons and no one in the meeting mentioned a RIF (Safft Dep. 27:8-13; 45:13-20; Blair Aff. ¶5-6; Trackim Aff. ¶6-7) and Mr. Fortunato's testimony that he was told by Mr. Safft on January 9, 2009 that the Separation Agreement was a RIF document that he needed to sign.  (Fortunato Dep. 17:23-18:3; 18:22-19-3; 19:11-21:24.) Moreover, Mr. Fortunato contends that as National Transportation Manager he was aware that there was an ongoing RIF at the time he was released (Fortunato Dep. 14:8-12), that he was released as part of the RIF (Id. at 22:11-13) and that Mr. Safft told him that he was being released pursuant to a RIF.  (Id. at 46:20-22.)  Defendants state that there was no RIF occurring in January, 2009 when Mr. Fortunato was terminated but a RIF had occurred prior to January, 2009 involving only the Supply Chain employees in Northern California.  (Safft Dep. 48:10-21; 49:9-25-50:1-19.)  Mr. Fortunato's attempts to contact Mr. Safft on January 13, 2009 were met with silence during the seven (7) day revocation period.  Mr. Fortunato found out at some point a few weeks after his termination that he was not terminated as part of a RIF.  (Fortunato Dep.

41:18-22.)

In a suit alleging that the waiver of rights is effective under the OWBPA, the employer bears the burden of establishing that the release of rights was both knowing and voluntary.  29 U.S.C. § 626(f)(3).  Review of the Separation Agreement in the light most favorable to Mr. Fortunato as the non-moving party reveals that there are disputes concerning material issues of fact which preclude entry of summary judgment on behalf of NWNA.  Because the Severance Agreement did not comply with the OWBPA's requirements, it cannot bar Mr. Fortunato's ADEA claim against NWNA.  Thus, I must deny summary judgment to NWNA at this time.

An appropriate Order follows.